2002 UT 82

**Patrick HEGARTY, Petitioner,**

v.

**BOARD OF OIL, GAS, AND MINING, DEPARTMENT OF NATURAL RESOURCES, State of Utah, River Gas Corporation, Texaco Exploration and Production, Inc., and Dominion Reserves–Utah. Inc., Respondents.**

No. 20000917.

Supreme Court of Utah.

Aug. 13, 2002.

Rehearing Denied Oct. 23, 2002.

H. Michael Keller, Thomas W. Clawson, Salt Lake City, for petitioner.

Mark L. Shurtleff, Att'y Gen., Thomas Mitchell, Kurt Seel, Asst. Att'ys Gen., Salt Lake City, for Board of Oil, Gas, and Mining Frederick M. MacDonald, George S. Young, Salt Lake City, for River Gas, Texaco, and Dominion Reserves.

Robin Stead, Norman, Oklahoma, and Jack M. Morgan, Troy A. Barsky, Salt Lake City, for amicus National and Utah Association of Royalty Owners.

HOWE, Justice:

## INTRODUCTION

¶ 1 Petitioner Patrick Hegarty seeks review of a Board of Oil, Gas, and Mining order imposing a 225% nonconsent penalty and denying retroactive pooling under the Utah Oil and Gas Conservation Act, codified at Utah Code Ann. §§ 40–6–1 to –19 (1998), relative to two wells draining petitioner's leased lands.

## BACKGROUND

¶ 2 The Drunkards Wash Field is part of the coalbed methane gas-producing Ferron Formation that underlies large portions of Carbon and Emery Counties in this state. In coalbed fields such as Drunkards Wash, methane gas forms a molecular attachment to the coal seam. As pressure is lowered in the well, the gas is removed and produced through fractures in the seam. Coalbed methane reservoirs are also stimulated by hydraulic fracturing and large quantities of water must be drained from the well.

¶ 3 In 1987, Texaco, Inc. drilled two initial wells in the field. These wells went into production in 1988 and as of the date of this appeal were still producing. Subsequently, River Gas Corporation formed the Drunkards Wash Federal Exploratory Unit (the "DW Unit") under the Mineral Leasing Act, 30 U.S.C. §§ 181 to 287 (1986 & Supp.2000), and specifically 30 U.S.C. § 226 (1986 & Supp.2000), entitled "Lease of oil and gas lands," which provides for cooperative development and operation of an oil or gas reservoir that encompasses sufficient federal lands. The DW Unit was approved effective December 28, 1990, and is administered by the Utah State Office of the United States Bureau of Land Management ("BLM").

¶ 4 The unit currently encompasses 90,-965.25 acres and is governed by a unit agreement according to a form specified in the BLM's regulations, 43 C.F.R. 3186.1 (1999), and by a voluntary unit operating agreement for coalbed methane development signed by River Gas Corporation as the unit operator. These agreements pool the interests of the more than 90 percent of mineral owners and lessees who have joined the DW Unit, and specify the manner in which they share on an acreage basis in production within the participating areas. The unit agreements provide no participation in methane gas production for owners who do not join ("uncommitted owners"), even those whose lands overlay the drainage fields of River Gas wells. However, all of the uncommitted owners in the DW Unit were provided opportunities to join the agreement as required under 43 C.F.R. 3181.3 (1999) (stating all owners "must be invited to join the agreement").

¶ 5 Seven members of one extended family ("Landowners") who owned mineral interests in 128 methane gas-producing acres within tract 161 of the DW Unit chose not to commit their lands to the unit. One family member sold his approximately 2.3% undivided interest in Landowners' tract to River Gas in 1998. Five of the current Landowners reside variously in California, New Mexico, and Virginia, and one resides in Salt Lake City, Utah. River Gas offered to lease all of Landowners' uncommitted lands relevant to this review. It initiated a number of attempts to reach an agreement with Landowners, all without result. None of these offers, however, gave Landowners notice of any individual

well situated to drain their property or an opportunity to participate proportionately therein. In June of 1999, petitioner Patrick Hegarty leased Landowners' interests.

¶ 6 Subsequent to the drilling of the 1987 wells, River Gas,[1] as operator of the unit, continued to drill wells in the unit on 160-acre spacing. By the fall of 1993, there were thirty-three producing wells and by the fall of 1994 a total of seventy-three producing wells in the DW Unit. Plans of unit development were approved by the Bureau of Land Management based on 160-acre well pattern density.

¶ 7 In 1991 and 1993, River Gas wrote to one of the Landowners, Larue Layne, who lived in California and served as spokesperson for Landowners, offering to lease their lands. Ms. Layne responded with questions and asked specifically when a well would be drilled. On October 18, 1993, River Gas replied by letter that it "plans a well 1½ miles south of your property, and if that well comes in as expected, then they will probably drill on your property, but cannot say when that will be." River Gas sent a follow-up letter dated November 3, 1993, urging Layne to lease before the offer was withdrawn on November 20 and adding, "I don't want there to be any misunderstanding as you consider our lease offer. Our company cannot promise that our operations in the area will result in your tract being put into production."

¶ 8 In March of 1995, River Gas wrote again to Layne, this time seeking to acquire a road right-of-way across her lands to a development area. The letter provided a diagram of the "approximate locations" of three wells that River Gas proposed drilling that year on state-owned lands, including the Utah 5-94 well. However, although River Gas stated that the drilling would be governed by the Drunkards Wash Federal Unit Agreement and the unit operating agreement, it gave no indication that any planned wells might drain Landowners' tract, nor did

it offer an opportunity to participate in any well.

¶ 9 Section 40-6-18 of the Utah Code provides, "This act shall apply to all lands in the State of Utah, lawfully subject to its police power, and shall apply to the lands of the United States or the lands subject to the jurisdiction of the United States." Utah Code Ann. § 40-60-18 (1999). Therefore, as unit operator of the DW Unit, River Gas was obligated to file an application for permission to drill ("APD") with the Utah Division of Oil, Gas and Mining (the "Division"). It did so, stating that the Utah 5-94 well would be drilled on 160-acre well density spacing. The Division approved the APD in May of 1995. Meanwhile, River Gas continued to seek a lease of Landowners' mineral rights. In July of 1995, it sent the owners certified letters containing a thirteen-page, fine-print proposed lease agreement. Each offer was expressly conditioned on agreement from all Landowners to lease to River Gas. Curiously, the letters made no mention of the recently approved Utah 5-94 well, 65.7% of whose drainage field lay beneath Landowners' property. Apparently unaware of this new well that was situated to drain their land, the owners did not respond to the lease proposal or otherwise take action to secure their rights.

¶ 10 On September 11, 1995, River Gas spudded[2] the Utah 5-94 well on state-owned land within the same 160-acre drilling block[3] as Landowners' uncommitted acres. The well began producing methane by November of that same year at the rate of approximately 500,000 cubic feet per day. From the beginning of production until the time of this review, the well had produced over 882 million cubic feet of methane. Beginning in November of 1995, River Gas and other committed owners began to reap the benefits of production from the Utah 5-94 well. Landowners, whose tract covered 65.7% of the

---

1. During the times relevant to this appeal, the DW unit was operated by River Gas of Utah, or River Gas Corporation ("River Gas") for and on behalf of respondents River Gas Corporation, Texaco Exploration and Production, Inc., and Dominion Resources Utah, Inc.

2. Oil and gas industry term for commencing to drill.

3. Under the federal Act, "unit" describes the entire unitized area, such as the DW Unit, consisting of many drilling blocks, while the state nomenclature refers to an individual drilling block as a unit.

drilling block, did not share in the production. And River Gas continued to drill.

¶ 11 By the fall of 1998, there were more than 170 wells producing coalbed methane gas on 160–acre drilling blocks in the DW Unit. On November 5, 1998, River Gas extended to Landowner Terry Olsen a thirty-day offer to lease or purchase the undivided interest of all the Landowners, which expired without being accepted. The letter made no mention of the drilling of any well, and contained no offer to participate on a single well basis. Seven *days* later, on November 12, River Gas spudded the Woolstenhulme 5–266 well only 350 feet north and 411 feet east of the boundaries of Landowners' tract. This well was drilled outside the drilling window established by the Division's general well-siting rule, Utah Administrative Code rule 649–3–2.1, placing it significantly closer to Landowners' tract than that rule permitted.[4]

¶ 12 Under rule 649–3–3, the Division has authority to grant a location exception upon receipt from the well operator of:

    1.1  Proper written application for the exception well location.

    1.2  Written consent from all owners within a 460 foot radius of the proposed well location. . . .

River Gas, however, failed to file the application or to request Landowners' consent to the exception. The Division approved the well without the required consent, through an "oversight," evidently under the misapprehension that the well was already part of a unit.

¶ 13 Late in 1998, Olsen was working on his land and noticed the Woolstenhulme 5–266 well "close enough that he could throw a rock and hit the well." Aware that they were receiving no proceeds from the well, the Landowners approached petitioner Patrick Hegarty, leased him their lands, and sought his help in protection of their interests. On July 13, 1999, shortly after Hegarty became involved, River Gas initiated Cause No. 243–2, a proceeding before the Board of Oil, Gas, and Mining (the "Board") relating to well spacing in lands outside of Landowners'

tract, but also seeking retroactive approval of the noncompliant location of the Woolstenhulme 5–266 well. Hegarty attended the hearing and entered a letter of objection, but withdrew when Division staff and personnel erroneously assured him that the proceedings did not affect his lands and recommended that he seek other avenues to protect his interests.

¶ 14 Subsequently, Hegarty filed a request for agency Action with the Board seeking 160–acre state spacing in the DW Unit. River Gas opposed the request. At the hearing, Hegarty made an oral request that the spacing order be retroactive to the dates of first production of the two wells, which River Gas opposed. On January 26, 2000, the Board announced its order effective as of that date granting the request for 160–acre spacing but denying retroactivity.

¶ 15 River Gas, its associates, and Hegarty were unable to agree on the terms of voluntary pooling. Therefore, Hegarty filed a request for agency action seeking pooling and requesting that the order be made retroactive to the date of first production. River Gas opposed retroactivity, arguing that pooling could only be retroactive to the effective date of the state spacing order because prior to that the correlative rights of the tract owners remained undefinable. River Gas further contended that its offers to lease the land satisfied the notice and offer requirement of Utah Code Ann. § 40–6–2(11), rendering Hegarty a nonconsenting owner under that provision because of Landowners' refusal of those offers. River Gas argued for a 300% penalty on the basis that the Utah 5–94 and the Woolstenhulme 5–266 wells were both on the "edge" of the DW Unit and were therefore "wildcat," or exploratory wells, involving a high risk to the driller.

¶ 16 Following the close of testimony at the hearing, the Board recessed briefly and then returned to announce its decision granting pooling but denying retroactivity and imposing a 225% nonconsent penalty. Hegarty seeks our review under Utah Code Ann.

---

**4.** Utah Admin. Code R649–3–2.1 provides:
    1. In the absence of special orders of the board establishing drilling units or authorizing different well density or location patterns for particular pools or parts thereof, each oil and gas well shall be located in the center of a 40 acre quarter-quarter section, . . . with a tolerance of 200 feet in any direction from the center location, a "window" 400 feet square.

§ 78–2–2(3)(e)(iv), which grants the Supreme Court appellate jurisdiction over final orders and decrees originating in formal adjudicative proceedings of the Board of Oil, Gas and Mining.

## STANDARD OF REVIEW

¶ 17 Under Utah Code Ann. § 63–46b–16 (4) (1997 & Supp.2001), the appellate court reviewing an agency action may grant relief if "the agency has erroneously interpreted or applied the law" and a party has been "substantially prejudiced." *See WWC Holding Co. v. Pub. Serv. Comm'n of Utah*, 2001 UT 23, ¶ 7, 44 P.3d 714. We review the Board's statutory construction of the spacing and pooling provisions of the Oil and Gas Conservation Act under a correction of error standard, granting the board no deference. *See Cowling v. Bd. of Oil, Gas & Mining*, 830 P.2d 220, 224 (Utah 1991). Under section 63–46b–16(4)(g), we uphold the Board's findings of fact if they are supported by substantial evidence. *See WWC Holding Co.*, 2001 UT 23, ¶ 8, 44 P.3d 714 (citing *Harken Southwest Corp. v. Bd. of Oil, Gas & Mining*, 920 P.2d 1176, 1180 (Utah 1996)).

## ANALYSIS

¶ 18 The Utah Board of Oil, Gas, and Mining filed a brief in this review, and the oil companies, consisting of Phillips Petroleum Company in substitution for River Gas Corporation, Texaco Exploration and Production, Inc., and Dominion Reserves–Utah, Inc., collectively filed a brief. For clarity, we will refer to the petroleum companies as River Gas, to the Board of Oil, Gas, and Mining as the Board, and to both together as respondents.

### A. FEDERAL AND STATE LAW

¶ 19 The interaction of federal and state law on a single oil and gas field makes this a case of first impression in Utah. Furthermore, as far as we can discover, no other court in the United States has addressed these circumstances. Therefore, we engage in a brief survey of the applicable laws.

¶ 20 The Utah Oil and Gas Conservation Act (the "Utah Act") controls oil and gas development in the state under sections 40–6–1 to –19 of the Utah Code (stating it is in the public interest "to provide exclusive state authority over oil and gas exploration and development") and section 40–6–18 of the Utah Code (stating "this act shall apply to all lands in the State of Utah"). However, tracts containing sufficient federal lands, such as the DW Unit, may be developed under 30 U.S.C. § 226 (1986 & Supp.2000) as implemented by 43 C.F.R. Pt. 3181 (1999) (the "Federal Act").

¶ 21 The Division staff surveyed both acts in a staff memorandum submitted to the Board in connection with Hegarty's request for a well spacing order. The memorandum compares federal unitization to state well spacing and notes that "unlike the Board, the BLM does not have the authority to force the unitization or compulsory pooling of non-federal acreage." As a consequence "the participation of non-federal acreage in federal exploratory units is completely *voluntary* and *elective* on the part of nonfederal mineral owners." Therefore, according to the Division, if a non-federal owner chooses not to commit his land to a federal exploratory unit, then that owner must on his own find other ways of protecting his correlative rights.

¶ 22 The memorandum further remarks that "[w]hen a mix of land types [i.e., federal and non-federal] is prevalent or uncommitted land exists in a federal exploratory unit, it may be necessary for the area to be covered by a Board spacing order to protect non-federal acreage." Therefore "there may be good reasons to maintain Board well spacing requirements within federal exploratory units when the federal unitization process may allow the drainage of non-federal or uncommitted lands to occur." The staff memorandum then describes the state pooling system with its provision for compulsory pooling to protect the interests of all parties and observes that "[i]n the general area of the Drunkards Wash Unit, it has been commonly accepted for some time that well spacing of one well per 160 acres promotes efficient recovery of the coalbed methane resource...."

¶ 23 Section 40–6–1 of the Utah Code declares that "it is in the public interest" to promote efficient and waste-free exploitation of oil and gas natural resources, while protecting "correlative rights." Section 40–6–

2(2) defines correlative rights as "the opportunity of each owner in a pool to produce his just and equitable share of oil and gas in a pool without waste." To this end, the Board "may order the establishment of drilling units for any pool." *Id.* § 40–6–6(1) (establishing uniform spacing throughout the field). Furthermore, "[i]n the absence of a written agreement for pooling, the board may enter an order pooling all interests in the drilling unit for the development and operation of the drilling unit." § 40–6–6.5(2)(a). Thus, a party in interest to an oil or gas development field may seek a state spacing order defining drilling unit size, and then seek an order pooling the interests of all owners for cooperative development. *See Matter of SAM Oil, Inc.,* 817 P.2d 299, 305 (Utah 1991); *Cowling,* 830 P.2d at 225.

¶ 24 The Utah Act defines a consenting owner as "an owner who consents in advance to the drilling and operation of a well and agrees to bear his proportionate share of the costs of the drilling and operation of the well." Utah Code Ann. § 40–6–2(4) (1993). A nonconsenting owner, in contrast, is "an owner who after written notice does not consent in advance to the drilling and operation of a well, or agree to bear his proportionate share of the costs." *Id.* § 40–6–2(11). In addition to bearing its share of costs, plus a reasonable interest charge under section 40–6–6.5(4)(d)(i) to -(iii), the nonconsenting owner is subject to a penalty of not less than 150% or more than 300% of its share of development and production costs as defined in section 40–6–6.5(4)(d)(i)(D).

¶ 25 Unlike the Utah Act, the Federal Act, as noted in the staff memorandum, has no provision for compulsory pooling. Also in contrast to the Utah Act, the Federal Act has no definition for consenting or nonconsenting owners, no notice requirements, and no statutory penalty. Furthermore, the Federal Act does not formally mandate uniform spacing throughout the field. Therefore, participants share in production based on their percentage of acreage ownership of the committed lands in the whole unit, rather than

their percentage of the drainage field of an individual well. 30 U.S.C. § 226(m).

¶ 26 As further noted above, the Federal Act does not protect the rights of nonparticipating owners. However, it allows considerable latitude in the provisions of the ●unit operating agreement. For example, the participating owners themselves may invoke a nonconsent penalty. The record in the case before us contains a reference to a 500 percent nonconsent penalty to be levied against Landowners under the unit operating agreement if they sought to join the federal unit after receiving notice that their lands were being drained.

¶ 27 Notwithstanding their differences, however, the Utah and the Federal Acts share common objectives. Much like the Utah Act, the Federal Act states a purpose of "more properly conserving the natural resources of any oil or gas pool, field, or like area," and "adequately protect[ing] the rights of all parties in interest." *Id.*

### B. NONCONSENT PENALTY

¶ 28 The Board imposed on Landowners a 225% nonconsent penalty under section 40–6–6.5(4)(d)(i)(D).[5] However, section 40–6–2(11) premises a nonconsenting owner first upon "written notice." As the Board correctly paraphrases in its brief, the statute provides that a "nonconsenting owner is simply nothing more than a person who, after *written notice,* does not consent to the drilling and operation of *'a well'* or agree to share costs in *'a well'*." (Emphasis added.)

■■■■■ ¶ 29 Imposition of a statutory penalty demands strict adherence to statutory notice requirements. *See Sears v. Southworth,* 563 P.2d 192, 194 (Utah 1977); *see also Longley v. Leucadia,* 2000 UT 69, ¶ 22, 9 P.3d 762. Section 40–6–2(11) requires written notice relative to "a well" and our case law has strictly adhered to that requirement. We noted in *Bennion v. ANR Production Co.* that "[u]nder the statutory scheme estab-

---

5. The specific amount of the penalty was based on the Board's finding that "[a]t the time they were drilled, wells 5–94 and 5–266 were located near the edge of the known coalbed methane gas field, and for purposes of imposing a risk penalty under the facts of this matter, and for no other purpose, wells 5–94 and 5–266 constitute exploratory wells." Because we decide the issue on other grounds, we do not address the exploratory status of the wells.

lished by the Utah statute ... a nonconsent penalty is determined on a well-by-well basis. An election to participate is made anew each time an additional well is drilled...." 819 P.2d 343, 351 n. 11 (Utah 1991). Therefore, the threshold requirement for nonconsent is the establishment of written notice sufficient to trigger the necessity for consent and sharing of costs in a specific well impacting a landowner's tract, or deliberate refusal. Any communication that does not rise to this level falls short of fulfilling the statutory requirement for written notice. *Bennion* provides us with an example of proper statutory notice. In that case, "the letter dated March 20, 1990, in which ANR offered Bennion the opportunity to participate in the second well clearly states that the nonconsenting parties will be subject to the statutory penalty of 150 percent to 200 percent." *Id.* at 351 n. 12.

██ ¶ 30 In the instant case, however, we search in vain for evidence of any such communication, and the Board made no finding that River Gas gave Landowners specific written notice of either well. The findings of fact address only the "written offers" for lease agreements presented to Landowners and acknowledge that there was never an offer to "participate proportionately on an individual well basis." The Board concluded that River Gas had no obligation to extend offers to participate because Landowners had no interest in the relevant wells until entry of the spacing order. All of these issues, however, can be addressed only after establishment of statutory written notice. The Board found that Landowners "knew or should have known" the oil and gas characteristics of their property, their oil and gas ownership, and that "two unit wells were planned to be on or near their property." However, the Board ignored the nonequivalency of statutory written notice and "knew or should have known"

¶ 31 The Board concluded as a matter of law that Landowners failed to "accept or respond to the good faith offers" to lease their lands or otherwise take action to establish and protect their own interests and that the "failure to respond to or accept the offers, constitute[s] a refusal and result[s] in petitioner's Landowners becoming nonconsenting owners." The Board makes the same argument in its brief, relying on rule

649–2–9 of the Utah Administrative Code, which provides:

> 1. An owner shall be deemed to have refused to agree to bear his proportionate share of the costs of drilling and operation of a well under section 40–6–6[.5](6) if:
>
> 1.1 The operator of the proposed well has, in good faith, attempted to reach agreement with such owners for the leasing of the owner's mineral interests or for that owner's voluntary participation in the drilling of the well.
>
> 1.2 The owner and the operator have been unable to agree upon terms for the leasing of the owner's interest or for the owner's participation in the drilling of the well.

Utah Admin. Code R649–2–9 (2000). In its reliance on the rule, the Board has once again leapfrogged the notice requirement. The Utah Act states that " '[n]onconsenting owner' means an owner who *after written notice* does not consent...." Utah Code Ann. § 40–6–2(11) (emphasis added). An owner and written notice must be established before consent, or conversely refusal, can become an issue. Thus, the rule must necessarily remain dormant until triggered by statutory written notice, and in the absence of such notice, we do not reach the rule.

██ ¶ 32 Even the 1995 letter to Layne requesting a right-of-way across her lands and containing a map showing the three proposed wells could not provide statutory written notice of a well under the Utah Act. The 1995 letter and all of River Gas's offers to Landowners were made while the DW Unit was being operated under the Federal Act, which had no provision for participation on an individual well basis. Yet per-well participation is the substantial focus of the Utah Act, and of the notice requirement. In such a context, notice cannot be inferred. Only actual, detailed, specific, written notice of a *well* can satisfy the Utah Act.

¶ 33 Thus the written notice requirement moderates the stringency of the nonconsent penalty by assuring that no uninformed owner becomes nonconsenting by default. The instant case graphically illustrates the necessity for such protection. River Gas submitted written lease proposals to Terry Olsen

and to Landowners *after* well approval by the Division and within weeks or even mere days of initiation of drilling the two wells. Yet these lease proposals made no mention of the pending wells. Additionally, River Gas failed to give Landowners notice of the Woolstenhulme 5–266 well even when statutorily required to seek their consent to drill impermissibly close to their property in violation of the Utah well-siting rule. In these circumstances, River Gas stood to benefit at Landowners' expense by obeying what it apparently considered the letter of the law, without actually alerting Landowners to the immediate prospect of wells that would drain their land. Landowners had refused to lease their lands to River Gas before they knew of the wells, but on learning of wells draining their lands they promptly sought to participate through State spacing and pooling. Without the statutory written notice requirement, however, Landowners' original, uninformed refusal to lease would render them nonconsenting and occasion an exorbitant penalty for the benefit of River Gas.[6] The notice requirement prevents such inequity.

¶ 34 The Board's opinion is devoid of any finding of specific written notice of a well, and the record contains no evidence that Landowners had in fact received written notice, as required by the statute. Consequently, respondents can offer no valid statutory interpretation within which Landowners can be characterized as nonconsenting owners. The 225% nonconsent penalty imposed by the Board is defined as 225% of Landowners' proportionate share of the cost of each well. In the case of the Utah 5–94 well, 225 percent of a 65.7 percent interest equals approximately 148 percent of the *total* cost of the well. The penalty for the Woolstenhulme 5–266 well is much smaller, being based on a 16.3 percent interest, but is still a considerable amount. Therefore, in the correction of error resulting in substantial prejudice, we reverse the Board's conclusion that Landowners are nonconsenting owners and hold that the nonconsent penalty does not apply.

### C. RETROACTIVE POOLING

¶ 35 Landowners argue that the federal DW Unit does not fully protect correlative rights, and that "[o]nly the Board can do so, through well-spacing or field-wide unitization under the Conservation Act." This is accurate. However, while the Conservation Act provides the legal framework for protection, and the Board supplies the mechanism, the initiative must come from the interested parties.

¶ 36 In *Cowling v. Board of Oil, Gas & Mining*, we noted that "[an] owner's failure to take action to establish and protect his or her interest in production prior to the entry of a spacing order constitutes a waiver of that interest until a drilling unit is established." 830 P.2d 220, 228 (Utah 1991). We cited *Cowling* in *Adkins v. Board of Oil, Gas & Mining* for the principle that the "right protected by the Act 'initially is nothing more than an "opportunity" to produce a "just and equitable" share of oil and gas "without waste." ' " *Adkins*, 926 P.2d 880, 884 (Utah 1996) (quoting *Cowling*, 830 P.2d at 228).

¶ 37 Here, although Landowners had not received written notice of any specific well draining their land, they knew the location of their land and that wells were proposed in the general area. Moreover, correlative rights were well defined under the established DW Unit 160–acre spacing even before 1995. Landowners knew their correlative rights, or at least had notice to inquire after them. River Gas had alerted Landowners to the market interest in their mineral rights by inviting them to join the DW Unit and by offering to lease their lands. The 1995 right-of-way request to Layne showed the proposed location for the Utah 5–94 well. The record indicates that when the Utah 5–94 well was drilled in 1995 both River Gas and Landowners had access to enough information to support a request for state spacing, which both of these interested parties had standing to initiate.

---

6. The hearing transcript contains the following exchange:

Keller [representing Hegarty]: And River Gas' position, as I understand it, would be that when you get to that future point, then you would say, "It's time to space," and then ev-

erybody can just—that's not committed to the unit would share from that point on, and pay a 300 percent penalty, after they've been drained for, you know, five, six, ten, 15 years?
Ferrens [River Gas's petroleum engineer]: Yeah.

¶ 38 Landowners assert that section 40–6–7 of the Utah Act created an early duty for River Gas to seek state spacing. That provision applies to an "agreement for repressuring or pressure maintenance operations, cycling or recycling operations, including the extraction and separation of liquid hydrocarbons from natural gas, or for carrying on any other methods of unit or cooperative development or operation of a field or pool or part of either." Utah Code Ann. § 40–6–7(1) (1998). Such an agreement "is authorized and may be performed" and shall not be construed

> to violate any statutes relating to trusts, monopolies, or contracts and combinations in restraint of trade, if the agreement is approved by the board as being in the public interest and promotes conservation, increases ultimate recovery and prevents waste of oil or gas provided that the agreement protects the correlative rights of each owner or producer.

*Id.* Under subparagraph (2), "A plan for the development and operation of a pool or field shall be presented to the board and may be approved after notice and a hearing." *Id.* § 40–6–7(2).

¶ 39 Methane gas recovery in the DW Unit has involved depressurization, hydraulic fracturing, and draining. Therefore, River Gas was arguably eligible to create such an agreement with its associated legal protections. Approval under the statute would require protection of Landowners' correlative rights. However, Landowners' argument that section 40–6–7 created a duty for River Gas to seek state spacing fails because the statute provides that an agreement "is authorized and may be performed," rather than is required and must be performed. Therefore the statute is not mandatory, but merely permissive. It is an incentive, not a requirement for the described agreement. Furthermore, the statute does not specify or favor state spacing over leasing or unit participation as the mechanism for the protection of correlative rights.

¶ 40 Landowners further assert that only retroactive pooling will protect correlative rights and give all parties their just and equitable share as contemplated by the conservation act. It is true that here only retroactive pooling will give Landowners the share of production that they failed to secure for themselves by timely action. However, a good law, like a good parent, does nothing for a person that he or she can do independently, and it is not good law to cure one inequity by creating another.

¶ 41 We noted in *Adkins* that the other parties involved had relied for eighteen years on a state spacing order, unchallenged by plaintiff. *Adkins*, 926 P.2d at 884. In the instant case, the other owners involved include not only River Gas and the associated oil companies, but all of the owners participating in the DW Unit, including the Utah School Lands Trust. Since the 1995 and 1998 drillings of the 5–94 and 5–299 wells, all of these owners have relied on management of costs and production under the DW Unit with no challenge from Landowners. Here we will not upset the relying owners' settled expectations of past production in order to restore to Landowners the share of production that they failed to protect for themselves.

¶ 42 We held in *Adkins* that if the plaintiff "had been obstructed in his request for agency action or had been the victim of fraud or inequitable conduct, then the Board could possibly reach back into the past. Here, however, where the inaction was wholly voluntary, we can find no justification under the Act to do so...." *Adkins*, 926 P.2d at 884 (internal citations omitted). Here also, Landowners' inaction was wholly voluntary. Like Adkins, Landowners have presented no evidence of actual fraud, although River Gas's conduct was hardly exemplary. However deliberately River Gas may have omitted any mention of specific wells from its offers to lease, River Gas did not prevent Landowners from investigating the status of their own rights and taking action. Landowners point to River Gas's objection to the spacing order. However, an objection to a request for agency action does not, in itself, constitute obstruction, and, in fact, both the spacing and pooling orders were timely granted.

¶ 43 We clearly articulated in both *Adkins* and *Cowling* that parties in possession of the necessary information to act in protection of their own rights bear the responsibility for

doing so. The same principle applies here. River Gas fostered the formation and approval of the DW federal Unit and was operating according to the unit agreements. It had no duty to act contrary to its own interests by seeking another layer of regulation. River Gas's failure to initiate a request for agency action did not destroy Landowners' ability to do so. Landowners had, since 1995, substantially the same opportunity to seek state spacing and pooling that they exercised in 1999. By neglecting to protect their rights in the interim, Landowners made a passive choice to allow their land to be drained until they took action. Therefore, we affirm the Board's denial of retroactive pooling.

## CONCLUSION

¶ 44 We hold that Landowners are not statutory nonconsenting owners and we affirm the Board's denial of retroactive pooling. Consequently, we remand this case to the Utah Board of Oil, Gas, and Mining with instructions to strike the nonconsent penalty and to deduct from petitioner's post-pooling portion of production only his fair and reasonable share of costs as outlined in section 40–6–6.5, exclusive of any provisions directed to a nonconsenting owner.

¶ 45 Reversed in part, affirmed in part, and remanded.

¶ 46 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice RUSSON, and Justice WILKINS concur in Justice HOWE's opinion.