2003 UT App 275

**ROAD RUNNER OIL, INC., and Gavilan Petroleum, Inc., Petitioners,**

v.

**BOARD OF OIL, GAS AND MINING, Department of Natural Resources, Respondent.**

No. 20020710–CA.

Court of Appeals of Utah.

July 25, 2003.

Rehearing Denied Sept. 29, 2003.

Kelly Williams and Phillip W. Lear, Lear & Lear LLP, Salt Lake City, for Petitioners.

Mark L. Shurtleff, Attorney Generals Office, and Kurt Seel, Assistant Attorney General, Salt Lake City, for Respondent.

Before BENCH, DAVIS and
GREENWOOD, JJ.

## OPINION

DAVIS, Judge:

¶ 1 Road Runner Oil, Inc. (Road Runner) and Gavilan Petroleum, Inc. (Gavilan) appeal an order from the Board of Oil, Gas and Mining (Board) requiring Petitioners to permanently plug and abandon four wells in Duchesne County. We affirm.

## BACKGROUND

¶ 2 On November 9, 2000, Road Runner and Gavilan (collectively, Petitioners) were notified by letter from the Division of Oil, Gas and Mining (Division) that seven of their wells in Duchesne and Uintah Counties were not in compliance with Utah Administrative Code R649–3–36. This regulation requires owners of wells that have not been active or productive for five years to permanently plug the wells, unless the Division approves an extended shut-in time based upon a showing of good cause by the well operator. *See* Utah Admin. Code R649–3–36(3). The seven wells had not been active or productive for at least eight years.[1] The Board's letter also noted that Petitioners were not in compliance with Utah Administrative Code R649–3–15 and–16, which deal with pollution and surface damage control of oil wells and reserve pits.

¶ 3 At Road Runner's request, the Division held an informal hearing on the matter on December 14, 2000. At this hearing, the parties agreed to enter into a consent decree by January 4, 2001, to address the Division's concerns. The Division reserved the right to proceed with adjudicatory proceedings in the event that a consent decree was not reached. The Division and Petitioners failed to reach a consent decree, and on April 27, 2001, the Division ordered Petitioners to clean up the Birch 1–25 Well within thirty days. Petitioners commenced the clean up process in a timely fashion. However, on June 22, 2001, a landowner complained that the Birch 1–25 Well, located on his property, had not been cleaned up properly.

¶ 4 On July 10, 2001, the Division sought a Request for Agency Action to order Petitioners to permanently plug and abandon the seven wells that were not in compliance with Utah's Oil and Gas Conservation Rules. On August 22, 2001, the Board conducted a hearing as a formal adjudication. The Board issued its Findings of Fact, Conclusions of Law and Order on September 7, 2001, concluding that Petitioners violated R649–3–36 at each of the seven subject wells and ordered the permanent plugging and abandonment of each well. Notwithstanding the express provisions of R649–3–36(1.3), Petitioners did not contest the accuracy of the Division's records concerning Petitioner's liability, or put on evidence of the downhole integrity of the wells. *See* Utah Admin. Code R649–3–36(1.3). Petitioners did put on evidence that various third parties may have an interest in taking responsibility for the wells. The Board held this order in abeyance for a period of six months to allow Petitioners an opportunity to ascertain whether a third party, Wind River Resources Corporation (Wind River), would be interested in acquiring any of the seven wells. As a condition for this six-month abeyance, Road Runner and Gavilan were ordered by the Board to "take action to address all immediate threats to public safety, health and welfare within sixty (60) days of [the] Order." The Order also notified the parties of their rights to reconsideration and judicial review.

¶ 5 On February 27, 2002, at the end of the six-month abeyance period, the Board convened another hearing. "The purpose of the hearing was to allow Road Runner and Gavilan an opportunity to report on those arrangements [with Wind River] and thereby show cause why the wells ... should not be plugged and abandoned as ordered on September 7, 2001." At the hearing, Wind River indicated "its continued interest in and progress toward unit operation" covering three of

---

1. Although this dispute originally involved seven wells, we now deal with only four wells in Duchesne County (Duchesne County Wells). The Paiute Walker 1–7 well had been shut in for eight years. The other Duchesne County wells in question had been shut in for the following periods: fourteen years for Birch 1–25; at least fifteen years for Sorenson 1–5; and at least eighteen years for Sorenson 1–6.

the seven wells, known as the Roosevelt Unit Wells. However, Wind River "declined ... to take over operation of the [remaining four wells, known as the] Duchesne County Wells." Subsequently, in its Findings of Fact, Conclusions of Law and Order dated April 12, 2002, the Board again ordered Petitioners to plug and abandon the four Duchesne County Wells in which Wind River had no interest. As part of its reasoning, the Board found that the evidence of the "potential viability of the Duchesne County Wells is speculative, not supported by downhole evidence as required by [Utah Administrative Code] R649–3–36(1[.3]) and does not demonstrate what waste would be prevented or correlative rights protected by allowing [Utah Administrative Code] R649–3–36 to continue to be violated." The Board also found that Petitioners had remedied "all surface conditions which constitute immediate threats to health, safety, and welfare at the well sites with the exception of remediating the emergency pit for the Sorenson [ ]1–6 Well."

¶ 6 On May 10, 2002, Petitioners filed a "Petition to Modify Order or in the Alternative Petition for Rehearing." The Board granted the petition for the purpose of rehearing certain issues to resolve any ambiguity between its September 7, 2001 order and its January 8, 2002 order, each of which discussed different purposes for the February 27, 2002 hearing. Specifically, the September 7, 2001 order stated that the purpose of the February 27, 2002 hearing was to determine if Road Runner had made arrangements with Wind River to take responsibility for the wells. The January 8, 2002 order stated that the purpose of the February 27, 2002 hearing was to have Road Runner and Gavilan "present their report evaluating the subject wells for primary and secondary recovery of oil and gas resources or for plugging and abandoning." In a May 31, 2002 order, the Board set a July 31, 2002 hearing date and limited the petition and parties to addressing five questions.[2]

¶ 7 Testimony and arguments presented at the July 31, 2002, hearing resulted in the Board's August 16, 2002 order. This order reaffirmed the Board's previous orders to "plug, abandon, and restore" the Duchesne County Wells. Specifically, the Board found that the six-month abeyance period granted by the Board was to ascertain the interest of Wind River in taking over production of the wells. The Board also concluded that when considering the option of allowing a well operator to keep its wells shut-in longer than one year, the analysis under R649–3–36 "constitutes a weighing and balancing of various factors including, but not limited to, the benefits of [sic] society of keeping the well shut-in[ ] against the risk the well poses to human health, safety and the environment." In addition to considering the length of time that the wells had been inoperable or inactive, the Board also concluded that "[w]ell integrity data are a specific factor to be weighed as part of the good cause test."[3] In reaching

2. Specifically, the Board asked:
   A. Was the Board's written order dated September 7, 2001, a final, appealable order regarding each Respondent?
   B. If so, under what legal authority could the Board['s] September 7, 2001 Order be modified by a subsequent written Board order in this matter?
   C. Did the Board exercise that legal authority, if any, and did it in fact modify its September 7, 2001 Order? When and how?
   D. Assuming the purpose of the February hearing was that described in paragraph D of page 4, of the Board Order dated January 8, 2002, what is the proper legal test(s) to be applied in regards to the wells in question, e.g., is the good cause test described at R64[9]–3–36 applicable, and if so, what constitutes good cause for this

regulation. What are the factors to be weighed and balanced in deciding whether good cause had been demonstrated? Which party has the burden of proof to this legal test?
   E. In regards to the "Duchesne Wells[ ]" (as defined in the Board's Order dated April 12, 2002), very briefly describe the evidence supporting or refuting the legal test.
   Board of Oil, Gas and Mining, Findings of Fact, Conclusion[s] of Law and Order in Response to Respondent's Motion to Rehear, May 31, 2002, p. 5.

3. In making its determination of what constituted good cause, the Board adopted most of the good cause factors recommended by Petitioners. Petitioners urged adoption of the factors used by the State of Wyoming when determining whether wells should be plugged and abandoned. The

its decision, the Board concluded that "[Road Runner and Gavilan] failed to carry their burden of demonstrating good cause to keep the Duchesne Wells shut-in."

¶ 8 Road Runner and Gavilan now appeal the Board's decision to order plugging, abandonment, and restoration of the Duchesne County Wells. We affirm the Board's decision.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 On appeal, Road Runner and Gavilan argue the following substantially prejudiced them: (1) the Board's decision was not based upon substantial evidence; (2) the Board ignored evidence demonstrating good cause; (3) the Board erroneously interpreted and applied Utah Administrative Code R649–3–36; (4) the Board's decision was arbitrary and capricious, and contrary to the Board's prior practice; and (5) the Board's decision was an abuse of discretion and contrary to a rule of the Board.

■■■ ¶ 10 "Under Utah Code Ann. § 63–46b–16(4) [ (1997) ], the appellate court reviewing an agency action may grant relief if 'the agency has erroneously interpreted or applied the law' and a party has been 'substantially prejudiced.' " *Hegarty v. Board of Oil, Gas, and Mining*, 2002 UT 82,¶ 17, 57 P.3d 1042 (citation omitted). "A party alleging substantial prejudice from agency action is entitled to relief only if the agency action is not supported by substantial evidence." *Board of Equalization v. Sinclair Oil Corp.*, 853 P.2d 892, 892 (Utah 1993). Furthermore, when challenging an agency action as not based upon substantial evidence, appellants have a duty to "marshal all of the evidence supporting the findings and show that despite the supporting facts, the [Board's] findings are not supported by substantial evidence." *First Nat'l Bank of Boston v. County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990).

## ANALYSIS

¶ 11 Utah Administrative Code R649–3–36 delineates the procedures that must be followed if an oil well operator desires to shut-in or temporarily abandon its wells for a period longer than twelve months.

1. Wells may be initially shut-in or temporarily abandoned for a period of twelve (12) consecutive months. If a well is to be shut-in or temporarily abandoned for a period exceeding twelve (12) consecutive months, the operator shall file a Sundry Notice providing the following information:

   . . . .

1.3. An explanation and supporting data if necessary, for showing the well has integrity, meaning that the casing, cement, equipment condition, static fluid level, pressure, existence or absence of [u]nderground [s]ources of [d]rinking [w]ater and other factors do not make the well a risk to public health and safety or the environment [ (collectively referred to as "downhole integrity") ].

2. After review the Division will either approve the continued shut-in or temporarily abandoned status or require remedial action to be taken to establish and maintain the well's integrity.

3. After five (5) years of nonactivity or nonproductivity, the well shall be plugged in accordance with R649–3–24, unless approval for extended shut-in time is given by the Division upon a showing of good cause by the operator.

Utah Admin. Code R649–3–36(1), –36(1.3), –36(2)–(3). Petitioners argue that they did not need to show downhole integrity of the wells to obtain an extension of shut-in status of their wells. Petitioners also argue that although the four Duchesne County wells have not been active or productive for more than five years, "they were substantially prejudiced by the Board's failure to base its finding that Petitioners did not show 'good cause' on substantial evidence."

factors used in Wyoming include: the economic viability of the wells; any waste that may occur if the wells are plugged; threats to health, safety, and welfare; and the results of mechanical integrity testing upon the wells.

### I. Downhole Integrity and Substantial Evidence

¶ 12 We begin by analyzing Utah Administrative Code R649–3–36(1.3), which requires a well operator seeking an extension of shut-in status to show that the wells "ha[ve] integrity, meaning that the casing, cement, equipment condition, static fluid level, pressure, existence or absence of [u]nderground [s]ources of [d]rinking [w]ater and other factors do not make the well[s] a risk to public health and safety or the environment." Petitioners argue that since the Board did not require them to show downhole integrity of the Duchesne County Wells until the July 31, 2002 hearing, they were only required to remediate surface conditions. This regulation, however, clearly places an affirmative duty upon any well operator to provide evidence of downhole integrity respecting any well shut-in or temporarily abandoned for a period exceeding twelve months. *See* Utah Admin. Code R649–3–36(1), (1.3). At the August 22, 2001 hearing, Petitioners elected to focus upon the potential sale of the wells rather than address this duty.

¶ 13 Furthermore, Petitioners argue that the Board's requirement of conducting only surface clean-up at the well sites limited Petitioners' obligation. Utah Administrative Code R649–3–36(2) provides that the Board may "require remedial action to be taken to establish and maintain the well's integrity." Utah Admin. Code R649–3–36(2). Here, the remedial action was a precondition to a six-month extension for the limited purpose of determining whether another operator could take over wells that "shall be plugged" pursuant to R649–3–36(3). Utah Admin. Code R649–3–36(3). Temporary remedial action for a limited purpose does not entitle the operator to, nor show good cause for, continued shut-in status.

### II. Good Cause and Substantial Evidence

¶ 14 Next, we analyze Utah Administrative Code R649–3–36(3). This rule mandates plugging an oil well that has been inactive and nonproductive for five years. *See id.* The Board has discretion to extend a well's shut-in status if the operator shows "good cause" for the extension. *Id.* The rule places the burden of showing good cause upon the well operator. *See id.* "There is no settled understanding of what 'good cause' means; since the determination depends to a large extent upon the facts of each case, a wide latitude of discretion is necessarily vested in the trial judge." *Jackson v. Kennecott Copper Corp.*, 27 Utah 2d 310, 495 P.2d 1254, 1255 (1972).

¶ 15 "Under [Utah Code Ann. § ] 63–46b–16(4)(g)[ (1997) ], we uphold the Board's findings of fact if they are supported by substantial evidence." *Hegarty v. Board of Oil, Gas, and Mining*, 2002 UT 82, ¶ 17, 57 P.3d 1042. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Grace Drilling Co. v. Board of Review of the Indus. Comm'n of Utah*, 776 P.2d 63, 68 (Utah Ct.App.1989) (citation omitted). When determining if an agency decision is based upon substantial evidence, "we review the whole record before the court." *Id.* (quotations omitted). This review "consider[s] not only the evidence supporting the Board's factual findings, but also the evidence that 'fairly detracts from the weight of the [Board's] evidence.'" *Id.* (second alteration in original) (footnote and citations omitted). "[This] whole record test necessarily requires that a party challenging the Board's findings of fact must marshal[ ] all of the evidence supporting the findings and show that despite the supporting facts, and in light of the conflicting or contradictory evidence, the findings are not supported by substantial evidence." *Id.* (emphasis omitted) (quotations and citations omitted). If "inconsistent inferences can be drawn from the same evidence, it is for the Board to draw the inferences." *Id.* "We now review ... the record to determine whether the Board's findings are supported by substantial evidence." *Id.* at 68 n. 7.

¶ 16 The record contains substantial evidence supporting the Board's decision. Petitioners note that the Duchesne County Wells have been inactive and nonproductive for between eight and eighteen years despite the testimony of Petitioners' experts that the wells "projected considerable economic viability." Permanently plugging and abandon-

ing the wells could be costly to Petitioners and may impair future use of the well sites. In spite of the cost to plug and abandon wells that have "projected considerable economic viability," Petitioners have no plans to bring the wells into an active, productive state, nor could Petitioners secure the interest of a third party to bring the wells into such a state. One of the Division's rebuttal experts testified that "if there was utility to the well, we would see it in the form of someone actively wanting to produce these wells and get them back on line in a productive state."

¶ 17 Petitioners also note that the Board required them to clean up and remediate adverse surface conditions at their wells. The Board took note of these conditions after one property owner expressed a concern for his family's safety due to the conditions at Petitioners' Birch 1–25 well site. However, with the exception of the Sorenson 1–6 Well site, all of the surface conditions identified by the Division have been remediated by Petitioners.

¶ 18 The Board determined that granting an extension of a well's shut-in status after five years of inactivity would require meeting the minimum requirements for granting an extension of a well's shut-in status after twelve months of inactivity. As a result, Petitioners were required to demonstrate that their wells complied with the entirety of Utah Administrative Code R649–3–36. This would necessarily include a showing of downhole integrity of the wells. The record is devoid of any information regarding the downhole integrity of the Duchesne County Wells.

¶ 19 In light of the foregoing, Petitioners failed to demonstrate the absence of substantial evidence to support the Board's decision. First, the wells had been shut-in in excess of five years, thus mandating that the wells should be permanently plugged. *See* Utah Admin. Code R649–3–36(3). Second, Petitioners failed to establish the downhole integrity of the Duchesne County Wells, as required by R649–3–36(1.3). Simply remediating surface conditions in return for a six-month extension for a limited purpose under R649–3–36(2) does not meet all of the requirements of R649–3–36(1.3).

¶ 20 In addition to satisfying the requirements of R649–3–36(1) and –36(1.3) as a baseline for applying for an extension of shut-in status, Petitioners were required to show good cause that their wells should not be permanently plugged. *See id.* R649–3–36(3). While economic waste may occur if the Duchesne County Wells are permanently plugged and abandoned, such waste is outweighed by the risks the wells pose to human health, safety, and the environment. These wells had not been active for at least eight years and one had not been active for as long as eighteen years. The condition of the Birch 1–25 Well site prompted a complaint from a landowner that the site was unsafe. Moreover, while Petitioners argue that these wells will be profitable, the complete lack of plans by Petitioners and lack of interest by third parties to bring the wells into an active state suggests otherwise. Furthermore, the Board, in its August 16, 2002 order, stated that "[w]ell integrity data are a specific factor to be weighed as part of the good cause test." Petitioners failed to present well integrity data, which would aid in alleviating fears regarding threats to public safety from a well site that is not structurally sound.

¶ 21 We conclude that the Board based its decision upon substantial evidence.

### III. Petitioners' Other Arguments

¶ 22 Our determination that the Board based its decisions upon substantial evidence impacts Petitioners' other arguments. Petitioners' second argument is that the Board ignored Petitioners' evidence, which substantially prejudiced them. Petitioners, however, fail to illustrate how the Board ignored this evidence. The Board articulated specific, factual reasons when it found that Petitioners had failed to make a good cause showing. Here, the substantial evidence and regulatory framework relied upon by the Board simply outweighed Petitioners' good cause evidence.

¶ 23 Petitioners' third argument is that the Board erroneously interpreted Utah Administrative Code R649–3–36. "When reviewing the [Board's] application of its own rules, this court will not disturb the [Board's] interpre-

tation or application of one of the [Board's] rules unless its determination exceeds the bounds of reasonableness and rationality." *Brown & Root Indus. Serv. v. Industrial Comm'n,* 947 P.2d 671, 677 (Utah 1997). Since the Board's decision was based upon substantial evidence it falls clearly within the bounds of reasonableness and rationality.

¶ 24 Petitioners' fourth argument is that the Board's decision was arbitrary and capricious and contrary to the agency's prior practice. Claims that an agency action was arbitrary and capricious are reviewed for reasonableness and rationality. *See R.O.A. Gen., Inc. v. Utah Dept. of Transp.,* 966 P.2d 840, 842 (Utah 1998) (ruling that a state agency acted arbitrarily and capriciously because failing to follow its own rules is not a "reasonable and rational" interpretation of its own rules (quotations and citations omitted)). Again, because the Board based its decision upon substantial evidence that Petitioners failed to show good cause, the decision was reasonable and rational.

■■■ ¶ 25 Claims that an agency decision is contrary to the agency's prior practice are also reviewed to determine if an inconsistency is justified by a "fair and rational basis." *Steiner Corp. v. Auditing Div. of the Utah State Tax Comm'n,* 1999 UT 53,¶ 14, 979 P.2d 357 (quotations and citation omitted). The heart of Petitioners' argument on this point relies upon testimony that the Board has not acted upon other wells that have been shut-in in excess of five years. While this assertion may or may not amount to "prior practice," Petitioners make no showing that the Board's actions in this case are inconsistent with actions involving a similar fact pattern. Further, the Board's inability to deal with every inactive well is not enough to prove that the Board has acted contrary to prior practice.

¶ 26 Finally, Petitioners argue that the Board's decision was an abuse of discretion and contrary to a Board rule. Utah Code Ann. § 63–46b–16(4)(h)(i) (1997) gives appellate courts the authority to grant relief if the Board's action is "an abuse of the discretion delegated to the [Board] by statute." We defer to the Board's interpretation of the statute "when there is a grant of discretion to the [Board] concerning the language in question, either expressly made in the statute or implied from the statutory language." *Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 589 (Utah 1991). The language of Utah Administrative Code R649–3–36 grants the Board wide discretion in determining if a well operator has shown good cause. *See* Utah Admin. Code R649–3–36(3). We will not disturb an agency's ruling unless it exceeds "the bounds of reasonableness and rationality." *Osman Home Improvement v. Industrial Comm'n,* 958 P.2d 240, 243 (Utah Ct.App.1998) (quotations and citations omitted). Because the Board based its decision upon substantial evidence, the Board's decision did not exceed these bounds.

## IV. Substantial Prejudice

■■ ¶ 27 Although Petitioners argue that they have been substantially prejudiced by the Board's decision, because we conclude that the Board grounded its decision upon substantial evidence, we need not address this argument. However, it should be noted that "the test for substantial prejudice is not, as [Petitioners] claim[ ], the fact that [they] received an unfavorable result; rather, the test is whether [Petitioners were] given full and fair consideration of the issues." *Commercial Carriers v. Industrial Comm'n,* 888 P.2d 707, 713 (Utah Ct.App.1994). The Board allowed Petitioners to present and argue their position on three separate occasions, hence "[t]here is nothing [to] indicate [that] the Board failed to fully and fairly consider [Petitioners'] position." *Id.* Here, Petitioners simply received an unfavorable result.

## CONCLUSION

¶ 28 We conclude that the Board found that Petitioners had not shown good cause based upon the regulatory framework and substantial evidence before the Board. Because the Board's decision was based upon substantial evidence, we need not address whether Petitioners were substantially prejudiced by the Board's order. Accordingly, we affirm the Board's decision to order plugging, abandonment, and clean-up of the Duchesne County Wells.

¶ 29 I CONCUR: PAMELA T. GREENWOOD, Judge.

¶ 30 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Judge.